In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Alan D. EISENBERG, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Respondent,

v.

Alan D. EISENBERG, Respondent-Appellant.

Supreme Court

*No. 2007AP1083–D. Oral argument September 11, 2009.
—Decided February 18, 2010.*

2010 WI 11

(Also reported in 778 N.W.2d 645.)

For the respondent-appellant there were briefs by *Richard J. Cayo* and *Halling & Cayo, S.C.*, Milwaukee, and oral argument by *Richard J. Cayo* and *Alan D. Eisenberg.*

For the complainant-respondent there was a brief by *Paul W. Schwarzenbart* and *Lee, Kilkelly, Paulson & Younger, S.C.*, Madison, and oral argument by *Paul W. Schwarzenbart.*

¶ 1. PER CURIAM. Attorney Alan D. Eisenberg has appealed from a referee's report concluding that he engaged in professional misconduct and recommending that his license to practice law in Wisconsin be revoked.

¶ 2. We conclude that the referee's findings of fact are supported by satisfactory and convincing evidence. We further determine that the seriousness of Attorney Eisenberg's misconduct, when coupled with his exten-

sive prior disciplinary history, warrants the revocation of his license to practice law in Wisconsin. We also conclude that the full costs of the proceeding, which are $30,933.35 as of September 23, 2009, should be assessed against Attorney Eisenberg.

¶ 3. Attorney Eisenberg was admitted to practice law in Wisconsin in 1966. In 1970 he was suspended from the practice of law for one year for pursuing a course of vindictive and reckless harassment and psychological persecution of a judge. *See State v. Eisenberg,* 48 Wis. 2d 364, 180 N.W.2d 529 (1970). In 1988 he was suspended from the practice of law for two years for conflict of interest, offensive personality, and dishonesty, fraud, deceit, and misrepresentation. *See In re Disciplinary Proceedings Against Eisenberg,* 144 Wis. 2d 284, 423 N.W.2d 867 (1988). In 1996 he was publicly reprimanded for activity occurring during the 1988 suspension consisting of a failure to close out a trust account and failing to advise the Board of Attorneys Professional Responsibility upon his reinstatement that he had not closed the account. In 2004 he was suspended from the practice of law for one year for engaging in eight counts of misconduct committed in five separate matters. *See In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, 269 Wis. 2d 43, 675 N.W.2d 747. His license to practice law was reinstated in 2007. *See In re Disciplinary Proceedings Against Eisenberg,* 2007 WI 7, 298 Wis. 2d 578, 726 N.W.2d 634.

¶ 4. On May 11, 2007, the Office of Lawyer Regulation (OLR) issued a complaint against Attorney Eisenberg alleging two counts of misconduct in violation of the Wisconsin Rules of Professional Conduct for Attorneys. Both counts arose out of Attorney Eisenberg's representation of W.D.

¶ 5. In September 2000 the Jefferson County district attorney's office filed a criminal complaint against W.D. charging him with second-degree recklessly endangering safety, battery, and disorderly conduct. The criminal charges arose out of a report of domestic violence made by W.D.'s estranged wife, M.D. The criminal case was tried to a jury in Judge Randy Koschnick's court. The jury acquitted W.D. of all three charges. The jury returned its verdict around 8 p.m. on March 21, 2001.

¶ 6. At the time of the criminal trial, W.D. and his wife were also involved in a divorce action. Attorney Eisenberg represented W.D. in that case as well. M.D. was represented by Attorney Brad Wilcox. On March 22, 2001, the day after the return of the jury verdict in the criminal case, Attorney Eisenberg filed a civil complaint on behalf of W.D. against M.D. The complaint in the civil case alleged that M.D. had made false statements to the police, that the false statements caused W.D. to be falsely arrested and maliciously prosecuted, that W.D.'s character was defamed, that W.D.'s reputation was reduced such that others would not desire to associate with him, and that damages should be assessed against M.D.

¶ 7. Attorney Eisenberg filed the civil complaint just before a scheduled pretrial conference with the family court commissioner in the divorce action. Attorney Eisenberg approached M.D.'s divorce attorney, Brad Wilcox, prior to the pretrial conference, accompanied by W.D. and W.D.'s mother. Attorney Eisenberg asked Attorney Wilcox why M.D. was not present. According to Attorney Wilcox, Attorney Eisenberg said, "I've got something for her," and then said that M.D. was a liar and had perjured herself and wanted to know where she was so he could serve her. Attorney Wilcox accepted service of the summons and complaint for M.D. because he felt she would be distressed if she was personally served with the

papers. During the conference with the family court commissioner, Attorney Eisenberg again called M.D. a liar and a perjurer. Attorney Eisenberg also told the commissioner that the jury in the criminal case had "stormed the judge's chambers and demanded to know why the woman [M.D.] was not being prosecuted for perjury."

¶ 8. When M.D. learned about the civil suit, she told Attorney Wilcox she wanted to file bankruptcy. Attorney Wilcox told her a judgment would not be dischargeable in bankruptcy and urged her to retain Attorney Raymond Krek to represent her.

¶ 9. On March 26, 2001, four days after filing the civil suit, Attorney Eisenberg faxed a copy of the complaint to a local newspaper, the *Daily Jefferson County Union*. He spoke with a reporter and repeated the story about jurors allegedly going to Judge Koschnick's chambers and asking that M.D. be prosecuted for perjury. The newspaper published this statement.

¶ 10. Attorney Krek filed an answer on M.D.'s behalf denying the allegations of the complaint and asserting affirmative defenses and counterclaims against W.D. Attorney Eisenberg filed a reply to the counterclaims. Attorney Krek amended the answer and asserted a counterclaim alleging the complaint against M.D. was frivolous under Wis. Stat. § 814.025 (2001–02).[1] On June 18, 2001, Attorney Krek filed a motion to dismiss and a

---

[1] Wisconsin Stat. § 814.025 (2001–02) states: Costs upon frivolous claims and counterclaims.

 (1) If an action or special proceeding commenced or continued by a plaintiff or a counterclaim, defense or cross complaint commenced, used or continued by a defendant is found, at any time during the proceedings or upon judgment, to be frivolous by the court, the court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees.

supporting memorandum of law, asserting both privilege and the judicial finding of probable cause in the criminal proceedings as grounds for dismissal. On July 5, 2001, Attorney Eisenberg's office filed and served the plaintiff's witness list in the civil case. Attorney Eisenberg said his associate, Jennifer Hoffmann, did 100 percent of the work on the witness list after he instructed her to speak to W.D. and his mother.

¶ 11. On July 23, 2001, a hearing on the motion to dismiss was held before Jefferson County Circuit Judge William Hue. Attorney Eisenberg had not filed a responsive brief before the hearing, and Judge Hue granted Attorney Eisenberg permission to file a brief by July 30, 2001. At the hearing, Attorney Eisenberg again said,

> the jury marched in to chambers . . . and suggested to the judge that [M.D.] should be criminally charged. I found out about it from either the jury foreman or one of the jurors calling me and telling me they had gone in

(2) The costs and fees awarded under sub. (1) may be assessed fully against either the party bringing the action, special proceeding, cross complaint, defense or counterclaim or the attorney representing the party or may be assessed so that the party and the attorney each pay a portion of the costs and fees.

(3) In order to find an action, special proceeding, counterclaim, defense or cross complaint to be frivolous under sub. (1), the court must find one or more of the following:

(a) The action, special proceeding, counterclaim, defense or cross complaint was commenced, used or continued in bad faith, solely for purposes of harassing or maliciously injuring another.

(b) The party or the party's attorney knew, or should have known, that the action, special proceeding, counterclaim, defense or cross complaint was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

(4) To the extent s. 802.05 is applicable and differs from this section, s. 802.05 applies.

and asked why this woman wasn't charged with a criminal slander or perjury or something.

After the hearing, Attorneys Krek and Eisenberg spoke, and Attorney Eisenberg told Attorney Krek that the only reason he sued M.D. was to get some leverage in the divorce case.

¶ 12. On August 8, 2001, the circuit court entered an order dismissing the malicious prosecution and false imprisonment claims. The court did not dismiss the abuse of process and defamation claims at that time. Between August 17 and September 25, 2001, Attorney Krek deposed the people on the plaintiff's witness list. W.D. said he had no personal knowledge concerning statements M.D. made to police officers and did not remember talking to officers regarding statements M.D. had made to them. Regarding his motivation for bringing the lawsuit, W.D. initially said, "I don't recall." He later said it was not to get back at M.D., but rather to obtain compensation for bad publicity he had received during the criminal case. Other people on the witness list said they were not aware they were on the list and had not spoken with Attorney Eisenberg before their depositions. None of the plaintiff's witnesses said they felt W.D.'s reputation in the community had declined as a result of the criminal prosecution.

¶ 13. In October 2001, at Attorney Eisenberg's request and over Attorney Krek's strong objection, Judge Hue directed the parties to mediate. At Judge Hue's request, Judge Koschnick agreed to serve as the mediator. After obtaining input from the parties as to dates they would be available, Judge Koschnick's staff scheduled the mediation for December 6, 2001. On December 4 and 5, 2001, Attorney Krek sent extensive materials to Judge Koschnick for the mediation. Attorney Eisenberg sent nothing.

¶ 14. On the morning of December 6, 2001, Attorney Eisenberg's office called Judge Koschnick's chambers to advise that Attorney Eisenberg would not be appearing for the mediation. At Judge Hue's request Judge Koschnick prepared an affidavit recounting Attorney Eisenberg's failure to appear.

¶ 15. On December 14, 2001, on the court's own motion, Judge Hue dismissed W.D.'s claims and granted default judgment to M.D. on her counterclaims as a sanction for Attorney Eisenberg's failure to appear for the mediation. In his memorandum decision, Judge Hue said:

> The Court reluctantly concludes that there is no sanction short of dismissal of Plaintiff's claim with prejudice and granting judgment by default upon the Defendant's counterclaim, along with an order refusing to allow Plaintiff to oppose Defendant's damage claim, which will serve to address and remedy Mr. Eisenberg's pattern of abuse and egregious conduct at issue, now and in the future. Dismissal, default and inability to participate in damages adjudication is a sad consequence of Plaintiff's decision to retain Mr. Eisenberg to prosecute and defend this case initially and throughout these proceedings. . . .

¶ 16. Attorney Eisenberg filed a notice of appeal. The appeal was dismissed.

¶ 17. On November 25, 2002, Attorney Krek filed an affidavit in support of a motion for relief under Wis. Stat. §§ 802.05 and 814.025. On January 7, 2003, the circuit court quantified M.D.'s damages and entered judgment for M.D. on her counterclaim. M.D. was awarded a total judgment in the amount of $121,905.78. This figure included double costs and interest under § 807.01(3). The court also issued a memorandum decision on M.D.'s motion for relief under Wis. Stat.

§§ 802.05 and 814.025. The court noted that M.D.'s request for relief under those statutes would require a special proceeding, concluded that Attorney Eisenberg had not received an opportunity to respond and had not waived his right to trial, and ordered that the court would conduct that special proceeding. An appeal was taken from the default judgment in favor of M.D., but it was dismissed.

¶ 18. On October 2, 2003, Judge Hue commenced the evidentiary hearing in the special proceeding on M.D.'s motion for attorney fees and costs for frivolous litigation. On the second day of the hearing, Judge Hue recused himself.

¶ 19. Reserve Judge Lawrence Gram was assigned to take over the matter and completed the special proceeding, hearing testimony on an additional three days. On January 2, 2004, Judge Gram entered findings of fact, conclusions of law, and a judgment on the motion for sanctions. Judge Gram concluded that Attorney Eisenberg violated § 802.05 by not making a proper investigation or reasonable inquiry into the grounds for the civil complaint and by not making sure the complaint was well-grounded in fact and as warranted by existing law. Judge Gram also concluded that Attorney Eisenberg violated § 802.05 not only by failing to ensure the pleadings were not used for the improper purposes of harassment, undue delay, or needless increase in the cost of litigation, but also by knowingly using the pleadings for improper purposes.

¶ 20. Judge Gram also concluded that Attorney Eisenberg violated § 814.025(3)(a) in that he both commenced and continued a frivolous action. Judge Gram concluded Attorney Eisenberg knew the action was commenced in bad faith and solely for the purposes of harassing and maliciously injuring M.D., and he knew

527

that continuing the action for defamation was in bad faith and solely for the purposes of harassing and maliciously injuring M.D.

¶ 21. Judge Gram also concluded that Attorney Eisenberg violated § 814.025(3)(b) in that he knew the action was without any reasonable basis in law or equity and could not be supported by any good-faith argument for the extension, modification, or reversal of existing law. Judge Gram said under the reasoning of *Jandrt v. Jerome Foods, Inc.*, 227 Wis. 2d 531, 597 N.W.2d 744 (1999), even if Attorney Eisenberg commenced the defamation action with a reasonable expectation that a basis existed in law or fact, after the depositions of the plaintiff's named witnesses, Attorney Eisenberg knew, or should have known, that the continuation of the action was frivolous as no basis in fact existed. Judge Gram awarded M.D. a monetary judgment in the amount of $102,660.79 against Attorney Eisenberg, and in the amount of $11,406.76 against W.D. Attorney Eisenberg requested reconsideration. The motion was denied.

¶ 22. Attorney Eisenberg appealed. The court of appeals affirmed. *Eisenberg v. Deutsch*, No. 2004AP1178, unpublished slip op. (Wis. Ct. App. Dec. 22, 2005). The court of appeals also deemed the appeal frivolous and remanded the matter to the circuit court for a determination of M.D.'s appellate attorney fees and costs. After this court denied a petition for review, Attorney Krek sought to schedule a hearing to determine and recover M.D.'s appellate fees and costs.

¶ 23. On July 11, 2006, Attorney Eisenberg filed pro se motions to adjourn and to deny fees for the appeal and the underlying action. He asserted the court of appeals had awarded appellate costs, but not necessarily "against him," and the trial court should consider

528

whether appellate costs should be awarded against appellate counsel, Attorney Herbert Bratt. Attorney Krek objected to Attorney Eisenberg's motions and moved for sanctions on the grounds that Attorney Eisenberg's motion to deny fees was frivolous. Attorney Eisenberg, represented by Attorney Wendy Patrickus, filed a motion to allocate appellate fees to Attorney Eisenberg's appellate counsel, Attorney Bratt, and to deny appellate costs after the date of the court of appeals' decision. The motion did not challenge the award of costs in the underlying action.

¶ 24. Judge Gram held a hearing on the appellate costs motion, after which he made findings of fact and conclusions of law and issued judgment. Judge Gram concluded that Attorney Eisenberg's motion to deny fees was frivolous; that after receiving Attorney Krek's response, Attorney Eisenberg failed to withdraw his unwarranted defense; and that Attorney Eisenberg caused delays and made unwarranted claims and defenses as a pattern of activity on remand. Judge Gram ordered Attorney Eisenberg to pay M.D. $22,298.93 in appellate costs and fees, of which $4,062 related to enforcement of the order for appellate costs. Attorney Eisenberg paid the attorney fees and costs for the original civil case and the appeal on August 25, 2006.

¶ 25. The OLR's complaint alleged two counts of misconduct:

> Count One: By filing a complaint and by pursuing the action in Jefferson County [] when he knew and when it was obvious that the lawsuit would serve merely to harass or maliciously injure [M.D.], [Attorney] Eisenberg violated SCR 20:3.1(a)(3).[2]

---

[2] SCR 20:3.1(a)(3) provides that in representing a client, a lawyer shall not "file a suit, assert a position, conduct a defense,

Count Two: By filing the pro se motion on July 11, 2006, to deny fees for the underlying action when he knew all appeals had been exhausted and the award affirmed, and that his motion was unwarranted under existing law and without a good faith basis for an extension, modification or reversal of existing law, [Attorney] Eisenberg violated SCR 20:3.1(a)(1).[3]

¶ 26. Richard C. Ninneman was appointed referee. A hearing was held over the course of four days, beginning on September 30, 2008.

¶ 27. Judge Koschnick testified at the hearing that after a jury has returned its verdict and the verdict has been read in open court and the lawyers agree the jury can be excused, his customary practice is to tell the jurors that they are excused but if they have questions or comments for him, he would be happy to meet with them in the following five or ten minutes. He said typically most of the jurors remain and he goes to the jury deliberation room and asks if they have any comments about how they were treated or if they have any suggestions for how the jury system in Jefferson County might be improved. He testified while he did not specifically recall a meeting with jurors in the W.D. criminal case, he did remember that at least several jurors did remain after returning their verdict. Judge Koschnick testified:

---

delay a trial or take other action on behalf of the client when the lawyer knows or when it is obvious that such an action would serve merely to harass or maliciously injure another."

[3] SCR 20:3.1(a)(1) states that in representing a client, a lawyer shall not "knowingly advance a claim or defense that is unwarranted under existing law, except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification or reversal of existing law; . . . ."

One of the jurors asked a question to the effect of will [M.D.], the alleged victim, be in trouble or subject to some type of criminal charge by virtue of their not guilty verdict. . . . The tone of the question, the demeanor of the juror was clearly one of concern for the welfare of the alleged victim. The question was asked in a way that led me to believe that the juror was concerned that the not guilty verdict would result possibly in the alleged victim being subject to some type of prosecution, and the juror did not want this to happen. . . . I tried to reassure her. I believe it was a female. . . . I told her that I had been a lawyer for 14 years before becoming a judge and I had never seen a victim arrested or prosecuted as a result of an acquittal.

¶ 28. When questioned about the newspaper article that said, "Jury stormed judge's chambers and demanded to know why the woman was not being prosecuted for perjury," Judge Koschnick testified:

No jurors were ever in my chambers. Security officers wouldn't let them back there. I wouldn't invite them back there for any reason. All my discussions are done in the jury deliberation room with jurors, and nobody demanded anything. And nobody stormed anything. It was peaceful and civilized throughout. We had a short discussion with the jurors, I did. They were excused. . . .

I also remember reading that newspaper article within a few days after the trial and being outraged at what was being claimed, and so that's why I remember the conversation, because the article made this false claim a few days later and I still remember my thoughts at the time. . . . I was also frustrated I couldn't respond because of judicial ethics. The civil suit had been filed. I wanted to tell that reporter that this was a lie in his newspaper, but I couldn't respond because of the judicial ethics requirement that I not comment when there's a pending case.

531

¶ 29. Although Attorney Eisenberg was represented by counsel at the hearing before the referee, he conducted the cross-examination of Judge Koschnick and also conducted the direct examination of M.D. The examination of M.D. consisted largely of Attorney Eisenberg asking M.D. why she was crying and breathing heavily. At one point, after counsel for OLR had objected to one of Attorney Eisenberg's questions and the referee said he saw no relevancy in Attorney Eisenberg's line of questioning, Attorney Eisenberg countered with, "The relevancy of it is that an observation was made that the crying and heavy breathing was complete fakery."

¶ 30. Attorney Eisenberg testified at the hearing that he filed the civil suit against M.D. because W.D. had told him, "I want to be cleared." Attorney Eisenberg testified that he had received two telephone calls from jurors the morning after the verdict in the criminal case, but neither one would give their name. He said both jurors told him they believed M.D. had lied, and one of the jurors told him "we went into the judge's chambers and talked about it." Attorney Eisenberg testified:

> I was extremely impressed by it, so that confirmed in my mind what I believed about [W.D.] and his need for immediate redress in the public eye, and in the public conscience, and for the sake of his peace of mind and his parents and his family and his friends. So, therefore, I knew that I knew enough about this case. I had investigated it to death. I had witnesses. I had talked to everybody and as far as I was concerned, the proof was in the pudding. I not only won the case but jurors called me.

¶ 31. The referee issued his report and recommendations on December 17, 2008. The referee con-

cluded that the OLR proved by clear, satisfactory, and convincing evidence the violation alleged in Count One of its complaint, but that it had failed to meet its burden of proof with respect to the allegations contained in Count Two.

¶ 32. The referee's findings of fact in support of his conclusion that Attorney Eisenberg filed and pursued the W.D. civil action to harass or maliciously injure M.D. included:

- Attorney Eisenberg rushed to file the W.D. civil action less than 18 hours after the acquittal verdict in the criminal case in order to serve the summons and complaint on M.D. at a previously scheduled pretrial conference in the divorce action.

- Attorney Eisenberg hurried to do this because he knew and believed that such action would further harass and intimidate M.D. and enable Attorney Eisenberg and his client to improperly gain an advantage or leverage in the pending divorce suit.

- In his rush to file the civil suit, Attorney Eisenberg failed to perform the appropriate legal research or factual inquiry which would have made it obvious that the claims would serve merely to harass or maliciously injure M.D.

- The complaint sought compensatory and punitive damages from M.D. at a time when Attorney Eisenberg clearly knew, from financial disclosures in the divorce action, that M.D. was virtually judgment-proof.

- Attorney Eisenberg went to the divorce pretrial expecting or at least hoping to personally confront and serve M.D. with the new legal process in the presence of W.D. and his mother, and when M.D. did not appear, Attorney Eisenberg confronted M.D.'s then-divorce attorney in a rude and intimidating manner.

- Attorney Eisenberg told the family court commissioner a totally false and untrue account about jurors storming Judge Koschnick's chambers.

- In furtherance of his campaign of intimidation, Attorney Eisenberg proceeded to contact the local newspaper for the purpose of not only publicizing the filing of the civil action, but to repeat the false account of the jury reaction to M.D.'s testimony in the criminal case so as to harass and maliciously injure M.D. in the eyes of the local community.

- Attorney Eisenberg again repeated the false account about the jury reaction in the criminal trial to Judge Hue, thereby continuing his campaign of attack to intimidate, harass, and maliciously injure M.D. in the eyes of the trial judge in the civil suit.

- Immediately after the July 23, 2001, hearing on motions to dismiss, Attorney Eisenberg told Attorney Krek that the civil action had been filed to gain leverage in the divorce action, and if the divorce case could be resolved, the civil suit would likewise be resolved.

- Attorney Eisenberg filed a witness disclosure list in the civil action without any reasonable inquiry as to the testimony of the witnesses identified so as to cause M.D. and her attorney the expense of pursuing discovery depositions of those witnesses, only to find that none of them were in a position to offer testimony in support of the claims against M.D. in the civil suit.

- Attorney Eisenberg's prosecution of the civil action may be characterized by his pattern of delays, requests for adjournment, and nonappearances at depositions and a mediation which he had requested.

- The trial court concluded the civil action was used for improper purposes and was frivolous. The court of appeals, in turn, found the appeal itself to be per se frivolous.

534

- Following denial of a petition for review, Attorney Eisenberg's pro se motion regarding denial of attorney fees both as to the trial court action and the appeal was unwarranted by law in Wisconsin and the law of the case, and represents another example of Attorney Eisenberg's continued campaign of intimidation, harassment, and acts to maliciously injure M.D.

- Attorney Eisenberg's conduct in the civil action became a vendetta on the part of Attorney Eisenberg to personally attack, harass, and maliciously injure M.D., which vendetta continued in the disciplinary proceeding when he subpoenaed M.D. to appear without any purpose relevant to the proceedings.

- Attorney Eisenberg's testimony in the disciplinary proceeding was deliberately evasive, inconsistent, contradictory, false, incredible, and untrustworthy, and Attorney Eisenberg showed no remorse for the seriousness of the allegations in the OLR's complaint.

¶ 33. The referee commented extensively on what he termed Attorney Eisenberg's lack of candor throughout the disciplinary proceeding. The referee found "Mr. Eisenberg's testimony under oath at various times to be deliberately evasive; inconsistent and contradictory; and false, incredible and impossible to believe." The referee was particularly troubled by Attorney Eisenberg's claim that one or more jurors had contacted him the morning following the acquittal verdict in the criminal case:

But the most preposterous testimony by Mr. Eisenberg relates to his account about a juror or two jurors contacting him on the morning following the acquittal verdict and claiming that the [W.D.] criminal jury stormed/marched into Judge Koschnick's chambers demanding that [M.D.] be charged with perjury. According to Attorney Wilcox, that afternoon Mr. Eisenberg

535

told the family court commissioner at a scheduling conference in the [] divorce action that "a juror" had called him that morning and when told about the new lawsuit he was filing, the juror purportedly responded "good, she deserves it." The following month, when Mr. Eisenberg spoke to a news reporter for the *Daily Jefferson County Union,* the news reporter testified that Mr. Eisenberg stated "a juror" called him. Three months later in a court argument before Judge Hue, Mr. Eisenberg stated: ". . . The jury came back with a not guilty, and the jury marched into . . . chambers and suggested to the judge that M.D. should be criminally charged. I found out about it from either the jury foreman or one of the jurors calling me and telling me they had gone in and asked why this woman wasn't charged with a criminal slander or perjury or something. . . ."

The next reference to this alleged jury reaction appears in Mr. Eisenberg's testimony before Judge Gram on December 23, 2003, during the special proceedings. Initially, Mr. Eisenberg testified about a phone call from a woman juror, but during cross-examination, he recalled for the first time that *two* jurors called him on the morning following the acquittal complaining about [M.D.]'s alleged perjury and wanting Mr. Eisenberg to do something about it.

At this disciplinary hearing, Mr. Eisenberg totally abandoned the single juror contact version of this event. He testified that the morning after the acquittal when he was in his office, he "got two phone calls, one from a woman, who did not want to give me her name, and I believe there was a man who called. . . . I was extremely impressed with the fact that I got calls from jurors. That doesn't happen all the time. . . ." This referee is skeptical of the change in Mr. Eisenberg's recollection from a phone contact from a single juror to two phone calls from two jurors.

536

Next, if two separate jurors took the trouble to locate and speak by phone with Mr. Eisenberg about the jury marching/storming into Judge Koschnick's chambers, allegedly complaining about M.D. committing perjury and eliciting Mr. Eisenberg's help, then why did both jurors refuse to give Mr. Eisenberg their names? ... This referee is skeptical about why two jurors go to the trouble of contacting Mr. Eisenberg in the first instance and then both refuse to identify themselves.

However, if these two jurors contacted Mr. Eisenberg to report this extraordinary event, but refused to reveal their names, is it not reasonable to expect that Mr. Eisenberg would contact Judge Koschnick's court personnel to verify the accuracy of this account? This is particularly true when you consider that Mr. Eisenberg had just spent the previous two days in trial before that court and on the afternoon of the alleged two juror calls, he was at the Jefferson County Courthouse to attend a pre-trial conference in the [] divorce proceedings. However, Mr. Eisenberg made no such contact. And if this juror contact occurred, is it not reasonable to expect an experienced criminal lawyer to report this to the Jefferson County District Attorney rather than contacting the editor of the local newspaper?

However, any questions about this entire incident are quickly resolved when one considers the testimony of Judge Koschnick himself. Judge Koschnick testified that as is his custom, he went to the jury room after the verdict in the [W.D.] criminal action to inquire about their general jury experience. He said one juror expressed concern to him that the acquittal verdict *not* result in any type of prosecution of [M.D.], which the juror did not want to see happen. Judge Koschnick was unequivocal that there were no jurors storming or marching into his chambers—something that neither he nor his bailiff would ever allow. There was no claim by any juror that [M.D.] had lied nor any request or

537

demand for any criminal action against [M.D.]. In fact, Judge Koschnick testified that seven years later he still recalls he "was outraged" when he read Mr. Eisenberg's version of the event as reported in the local paper. Judge Koschnick's testimony on this entire subject was very clear and very credible.

Therefore, either you have a completely fabricated story by two separate but unidentified jurors, which Mr. Eisenberg recklessly repeats to a family court commissioner, a newspaper reporter and a judge or you have a completely fabricated story by Mr. Eisenberg. There is no doubt in this referee's mind that the fabrication was the product of Mr. Eisenberg, under oath, in both the [W.D.] special proceeding and this disciplinary proceeding.

¶ 34. The referee noted that in the civil action, Judge Gram found that M.D. was a victim of domestic violence and that as a battered woman, M.D. was "vulnerable" to Attorney Eisenberg's cross-examination style which was described as putting "the witness 'through the wringer' in an uncivil and condescending manner, . . . ." The referee said when one considers Judge Gram found the purpose of the civil action was harassment, "one would think Mr. Eisenberg would think twice before calling [M.D.] as a witness in this disciplinary proceeding. He did not."

¶ 35. In describing M.D.'s testimony at the disciplinary hearing, the referee said M.D. "was clearly an emotionally distraught person." The referee found it significant that Attorney Eisenberg, not his attorney, conducted the examination. The referee noted the topics covered in the questioning were whether or not M.D. made false statements during the criminal trial, to which she responded, "No"; whether her emotional state at the disciplinary hearing was some kind of fakery;

whether she believed Attorney Eisenberg was only doing his job in representing W.D.; and whether she had met or spoken to Attorney Eisenberg before the criminal trial. The referee said none of this had any relevancy to the disciplinary charges and "when one considers Mr. Eisenberg's repeated references to M.D. as a 'liar' or 'perjurer' and her testimony at the criminal trial as 'lies' or 'perjury,' this referee is deeply troubled as to why M.D. was subpoenaed as a witness in this hearing in the first place." The referee said rather than exhibiting some remorse for his past conduct, Attorney Eisenberg's "subpoena herein directed to [M.D.] for no relevant reason whatsoever, indicates to this referee that the civil action had become a vendetta by Mr. Eisenberg against [M.D.] which should not go unpunished."

¶ 36. The referee noted that Judge Koschnick testified about M.D.'s "possible trauma" in facing Attorney Eisenberg's cross-examination during the criminal trial, but said he "frankly, believed her, . . . ." The referee also concluded "that [M.D.]'s emotional appearance at the hearing in this proceeding was no fakery or acting. She appeared to be genuinely upset at being forced to endure another confrontation with, and cross-examination by, Mr. Eisenberg."

¶ 37. Turning to the recommended discipline, the referee noted that at the initial scheduling conference, Attorney Eisenberg's counsel objected to references in the OLR's complaint regarding Attorney Eisenberg's prior discipline, claiming that history might improperly influence the referee in his initial determination of whether Attorney Eisenberg violated the supreme court rules as alleged in this case. At that time the referee represented that he would not review the reported disciplinary cases until he had reached his findings of

fact and conclusions of law. Having made those findings and conclusions, the referee said he reviewed, for the first time, Attorney Eisenberg's four prior disciplinary matters.

¶ 38. The referee noted that in the 2004 action the referee had recommended revocation, pointing to Attorney Eisenberg's substantial disciplinary history and what that referee characterized as a propensity to lie under oath; a propensity to minimize culpability by trying to place blame on others, portraying himself as the victim, and claiming there was no real injury; and no demonstration of remorse. Referee Ninneman said:

> In the instant proceedings this referee has the very same concerns, arrived at independently and without the benefit of first reviewing [*Eisenberg,* 269 Wis. 2d 43]. The court in [*Eisenberg,* 269 Wis. 2d 43] rejected the revocation recommendation, given Mr. Eisenberg's age, . . . .
>
> Although some of Mr. Eisenberg's actions in the [W.D.] civil action pre-dated the decision in [*Eisenberg,* 269 Wis. 2d 43], his conduct in this disciplinary proceeding does not. When one considers that Mr. Eisenberg embarked on another campaign to harass, intimidate and maliciously injure another, this time not a judge but a litigant, and that this campaign continued in this disciplinary proceeding, he is undeserving of an age deferment. This, coupled with his evasive, contradictory, incredible and false testimony in this proceeding makes OLR's recommended six-month suspension inadequate. Considering that "Wisconsin has long adhered to a system of progressive discipline," *Disciplinary Proceedings Against Converse,* 2006 WI 4, 287 Wis. 2d 72, 89, 707 N.W.2d 530, 538, this referee strongly recommends that Mr. Eisenberg's license to practice law be revoked.

¶ 39. The referee also recommended that Attorney Eisenberg be assessed the full costs of the proceeding.

¶ 40. On appeal Attorney Eisenberg argues that the OLR failed to prove by clear, satisfactory, and convincing evidence that his actions were taken for no reason other than to harass or maliciously injure M.D., and that he had a subjective intent to do so. He also argues that in the event this court finds he did violate SCR 20:3.1(a)(3), a reprimand would be an appropriate sanction.

¶ 41. Attorney Eisenberg admits that he is an aggressive litigator, and he concedes that M.D. may be an emotionally fragile person. He says although the referee and Judge Koschnick may have felt sympathy for M.D., neither that sympathy nor the fact that M.D. may have been the type of person who would find Attorney Eisenberg's litigation style to be painful, constitutes evidence, let alone proof, that the only purpose for filing the civil suit was to harass or injure M.D. Attorney Eisenberg strongly argues that the evidence does not support a finding of a subjective intent on his part to harass or injure M.D. Although the referee criticized Attorney Eisenberg's decision to call M.D. as a witness at the disciplinary hearing and personally conduct the examination of her, Attorney Eisenberg argues his examination of M.D. was courteous, relatively brief, and devoted primarily to topics relevant to whether he had a legitimate purpose in filing the civil suit.

¶ 42. Attorney Eisenberg argues that even if this court were to agree that the OLR did establish a violation of SCR 20:3.1(a)(3), the referee's recommendation of revocation is "wildly disproportionate to the sanctions suffered by other attorneys found to have violated this rule." He argues there is not a single

reported case in which a sole count of a frivolous filing has resulted in the revocation of an attorney's license. He argues that prior cases involving SCR 20:3.1(a)(3) have generally resulted in reprimands or short-term suspensions.

¶ 43. In support of his claim that a reprimand is an appropriate level of discipline, Attorney Eisenberg points to *In re Disciplinary Proceedings Against Caldwell,* 171 Wis. 2d 393, 491 N.W.2d 482 (1992), in which the attorney was found to have violated a predecessor of SCR 20:3.1(a)(3) by filing an action when he knew or when it was obvious it would serve merely to harass or maliciously injure the defendants. The attorney in that case was publicly reprimanded. Attorney Eisenberg notes that the OLR itself sought only a six-month suspension at the time it filed its complaint in this case, and that sanction was predicated on an alleged violation of two counts of misconduct, only one of which was sustained by the referee.

¶ 44. The OLR asserts that the referee's conclusion that Attorney Eisenberg violated SCR 20:3.1(a)(3) finds its factual foundation in the referee's assessment of undisputed evidence and the credibility of witnesses whose testimony the referee personally observed. The OLR says there is no basis for reversing the referee's conclusion that Attorney Eisenberg violated SCR 20:3.1(a)(3) since that conclusion rests on the referee's assessment of witness credibility and the referee's findings of fact are not clearly erroneous.

¶ 45. The OLR argues that Attorney Eisenberg is again seeking to retry the sanctions issue in the underlying civil action. The OLR says according to Attorney Eisenberg, he is not a wrongdoer; he was victimized in the underlying action and he is being victimized here. The OLR notes in the course of the disciplinary hear-

ing, Attorney Eisenberg's counsel referred to the "Eisenberg Effect" and claimed that no other lawyer in this state would have been sanctioned for the conduct in the underlying case; no lawyer other than Eisenberg would find himself on the receiving end of a disciplinary prosecution for the conduct at issue. The OLR says:

> While Eisenberg apparently prides himself on the rude and abrasive style he employs as a trial lawyer, sanctions were not imposed against him in the Civil Action based on style. Nor did the Referee reject his explanations for his motive in commencing and continuing the Civil Action based on style. In the Civil Action, Judge Hue gave Eisenberg plenty of latitude, if anything more latitude than would be afforded to most lawyers. Eisenberg abused it. It was not Eisenberg's style, it was the substance of Eisenberg's conduct which led to sanctions. A different "A" word applies. Eisenberg was not sanctioned for being an "aggressive litigator," he was sanctioned for being an abusive litigator; a lawyer the referee found wholly lacking in credibility.

¶ 46. The OLR suggests that if there is in fact an "Eisenberg Effect," it is Attorney Eisenberg's abusive conduct and disrespect for other parties, other lawyers, and the legal system which leads to sanctions.

¶ 47. The OLR notes that in concluding there was sufficient evidence to support a finding that Attorney Eisenberg knew the civil suit would serve merely to harass or maliciously injure M.D., the referee focused on Attorney Eisenberg's lack of candor, his lack of remorse, and other evidence supporting detailed findings as to his intent, including the fact that a criminal acquittal does not mean that a complaining witness made false statements actionable as defamation; the fact that a vulnerable witness under stress becomes confused under oath or admits inconsistencies while

testifying at trial does not mean that witness made false statements actionable as defamation; the fact that the complaint in the civil action was filed the day after the criminal acquittal and was filed without interviewing a single third-party witness later included in the plaintiff's witness list; the fact that Attorney Eisenberg sought to personally serve the process on M.D. the day after he had reduced her to tears on the witness stand with his client and client's mother present as an audience; the fact that Attorney Eisenberg called M.D. a liar and a perjurer at the conference with the family court commissioner and indicated the civil action would delay the divorce proceeding; the fact that soon after filing the complaint Attorney Eisenberg contacted the local newspaper to seek out publicity about the suit; the fact that in justifying his filing of the suit, Attorney Eisenberg purported to rely on the results of a polygraph examination of his client under circumstances where no foundation was laid for polygraph results to be admissible in the case; and the fact that the polygraph results indicated W.D. had thrown M.D. on the ground, establishing that M.D. had in fact been physically abused by her husband, notwithstanding his acquittal.

¶ 48. The OLR says ample evidence supports the referee's findings that Attorney Eisenberg commenced and continued the civil action against M.D. when he knew or it was obvious to him that the action would serve merely to harass or maliciously injure her. The OLR asks this court to affirm the referee's legal conclusion that Attorney Eisenberg violated SCR 20:3.1(a)(3).

¶ 49. The OLR continues to recommend a suspension of at least six months duration. The OLR says the cases upon which Attorney Eisenberg relies in support of his argument that he should merely be reprimanded

"do not present a multiple recidivist attorney with a disturbing disciplinary history like Eisenberg's." The OLR says:

> Positions Eisenberg has advanced in this defense of this matter, unfortunately, illustrate the same pattern seen in his most recent disciplinary case; a litany of excuses and denials of personal responsibility for the conduct which led to the initiation of the disciplinary action, and ultimately expressions of defiance and disrespect for the disciplinary process.

¶ 50. The OLR asks this court to impose discipline commensurate with the violations as necessary and appropriate for the protection of the public. It also asks this court to assess all costs of this proceeding against Attorney Eisenberg.

¶ 51. A referee's findings of fact are affirmed unless clearly erroneous. Conclusions of law are reviewed de novo. *See In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, ¶ 5, 269 Wis. 2d 43, 675 N.W.2d 747. The court may impose whatever sanction it sees fit regardless of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶ 52. Attorney Eisenberg has failed to show that any of the referee's findings of fact are clearly erroneous. Accordingly, we adopt them. The circuit court and the court of appeals declared the W.D. civil action to be frivolous. Attorney Eisenberg was assessed a hefty monetary penalty, which he paid. Attorney Eisenberg does not ask this court to revisit the findings of frivolousness or the sanctions imposed against him by the lower courts, as that would be improper. The determi-

nation that sanctions were appropriately imposed against Attorney Eisenberg for violating Wis. Stat. § 814.025 by initiating and maintaining a suit in order to harass M.D. has been affirmed by the court of appeals, and this court denied a petition for review. That determination may not be collaterally attacked in a disciplinary proceeding. *See In re Disciplinary Proceedings Against Lauer,* 108 Wis. 2d 746, 754, 324 N.W.2d 432 (1982).

¶ 53. *Lauer* was a disciplinary proceeding against an attorney charged with knowingly maintaining a frivolous action as proscribed by then-SCR 20.36. The provisions of former 20.36 are now found, in substantially the same form, in SCR 20:3.1. In the *Lauer* case, a circuit court had ordered the attorney to pay costs and reasonable attorney fees pursuant to Wis. Stat. § 814.025 (1979–80) for bringing a frivolous claim. The Board of Attorneys Professional Responsibility filed a misconduct complaint against Attorney Lauer, asserting he had violated SCR 20.36 because he knew, or should have known, that the frivolous action he had commenced in circuit court was without any reasonable basis in law or equity and could not be supported by a good-faith argument for the extension, modification, or reversal of existing law. The referee in *Lauer* recommended that a private reprimand be issued. Attorney Lauer appealed, arguing that the referee had improperly concluded that Attorney Lauer had violated SCR 20.36 solely on the basis of the previous determination by the circuit court that he had violated the frivolous claim statute.

¶ 54. The *Lauer* court agreed that a finding of frivolousness under the statute could not, per se, constitute a violation of a disciplinary rule. *Lauer* pointed out that although the statute and the rule were similar,

they were not identical, and the assessment of costs under the statute does not, in and of itself, constitute a violation of the professional conduct rule. The *Lauer* court explained:

> However, it does not follow that where there is a violation of the statute there must be a violation of the disciplinary rule. To the extent they treat the same activity, the statute and the rule differ significantly. A violation of the statute requires that a party or a party's attorney knew or should have known that the action, special proceeding, counter-claim, defense or cross-complaint was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law. A violation of SCR 20.36 requires that the claim or defense unwarranted under existing law must be *knowingly* advanced.

108 Wis. 2d at 757 (emphasis in original).

¶ 55. The *Lauer* court also noted that under the frivolous claim statute, the test applied is an objective one. By contrast, under the disciplinary rule, the appropriate test is subjective because the referee or reviewing court must determine whether an attorney has violated a disciplinary rule that sets forth the minimum level of conduct below which no lawyer can fall without being subject to disciplinary proceedings. The *Lauer* court wrote:

> In making that determination in the context of SCR 20.36(1)(b), we find it appropriate to apply the subjective standard, that is, *whether the attorney, in fact, knew the claim he was advancing was unwarranted* under existing law and could not be supported by a good faith argument for an extension, modification or reversal of existing law. Such knowledge is an issue of fact which, in the context of an attorney disciplinary

proceeding, must be established by clear and satisfactory evidence, . . . while a finding of frivolousness under sec. 814.025, Stats., must be based on a preponderance of the evidence.

108 Wis. 2d at 758 (emphasis added and internal citations omitted).

■■

¶ 56. Thus, in the instant matter, the focus of the inquiry before the referee, and now before this court, is whether there was clear and satisfactory evidence that Attorney Eisenberg filed a civil suit knowing that the suit would serve merely to harass or maliciously injure M.D. The referee's detailed findings of fact, as summarized above, clearly demonstrate that the OLR has met its burden of proof. The record clearly establishes that Attorney Eisenberg had no good-faith legal basis for filing the civil lawsuit, but rather his motive was part of a continuing campaign to intimidate, harass, and maliciously injure M.D.

¶ 57. The record supports the referee's conclusion that Attorney Eisenberg rushed to file the civil suit less than 24 hours after the acquittal verdict in the criminal case hoping to personally confront M.D. at the divorce pretrial conference. When he learned that M.D. was not going to be present at the conference, Attorney Eisenberg confronted M.D.'s divorce attorney in a rude and intimidating manner. After rushing to file the baseless civil suit, Attorney Eisenberg had numerous opportunities to dismiss the case but instead pressed on with his campaign of harassment and intimidation. His tactics included contacting the local newspaper, failing to appear for the mediation he had demanded, and repeating and embellishing the false account about the reaction of the jury in the criminal case. Attorney

Eisenberg's campaign of harassment and intimidation toward M.D. continued into the disciplinary proceeding itself, as evidenced by Attorney Eisenberg's decision to personally examine M.D. at the hearing before the referee.

¶ 58. We agree with the referee that the evidence in this record is sufficient to support a determination that Attorney Eisenberg "filed a suit, asserted a position, . . . or took other action on behalf of [W.D.] when [he] [knew] or when it [was] obvious that such an action would serve merely to harass or maliciously injure another." The referee's findings of fact are supported by clear and convincing evidence and we adopt them. We also adopt the referee's conclusions of law flowing from those findings of fact.

¶ 59. Turning to the appropriate sanction, as the referee noted, Wisconsin has long adhered to a system of progressive discipline. *See In re Disciplinary Proceedings Against Converse,* 2006 WI 4, ¶ 37, 287 Wis. 2d 72, 707 N.W.2d 530. As we noted in 2004 when we suspended Attorney Eisenberg's license to practice law for one year, his disciplinary history has spanned four decades and demonstrates a clear pattern of inappropriate behavior. *See In re Disciplinary Proceedings Against Eisenberg,* 269 Wis. 2d 43, ¶ 33. We commented that the violations at issue in that case "would certainly warrant revocation, . . . ." *Id.,* ¶ 34. However, we did not impose that sanction because, "[g]iven Attorney Eisenberg's age, revocation might effectively prohibit him ever practicing law again." *Id.*

¶ 60. If Attorney Eisenberg had no prior disciplinary history, or if he had a lesser disciplinary history, revocation would not be on the table. However, this is the fifth time Attorney Eisenberg has been disciplined.

We are cognizant that the majority of the conduct at issue here occurred prior to or concurrent with the conduct at issue in the 2004 disciplinary case. A small amount of the conduct at issue did post-date the 2004 suspension. In determining the appropriate sanction, we note that there are some disturbing similarities between the conduct in the instant case and the conduct which formed the basis for Attorney Eisenberg's first suspension in 1970.

¶ 61. In the 1970 case this court found that Attorney Eisenberg pursued a course of vindictive and reckless harassment and psychological persecution against a Milwaukee County judge. Attorney Eisenberg's conduct was of such aggravated nature as to cause the judge great mental suffering and anguish. *State v. Eisenberg*, 48 Wis. 2d at 367–68. In the instant case, Attorney Eisenberg pursued a course of vindictive and reckless harassment and psychological persecution against M.D. His conduct was of such aggravated nature as to cause M.D. great mental suffering and anguish.

¶ 62. In the 2004 proceeding we expressed the highest concern over Attorney Eisenberg's continued and persistent inability to comport himself with the behavior that is expected of attorneys. *See In re Disciplinary Proceedings Against Eisenberg*, 269 Wis. 2d 43, ¶ 33. The facts of this case have served only to heighten our concern that Attorney Eisenberg is apparently unable to conform his conduct to the standards expected of all members of the Wisconsin bar. While the current misconduct, standing alone, would not warrant revocation, the behavior at issue here is the latest in a long line of episodes of misconduct permeating Attorney Eisenberg's entire legal career. In light of the aggravated nature of the misconduct and Attorney

550

Eisenberg's extensive disciplinary history, we conclude that no sanction short of revocation would be sufficient to protect the public, achieve deterrence, and impress upon Attorney Eisenberg the seriousness of his misconduct. We also agree with the OLR that Attorney Eisenberg should be assessed the full costs of the proceeding.

¶ 63. IT IS ORDERED that Count Two of the OLR's complaint is dismissed.

¶ 64. IT FURTHER IS ORDERED that the license of Alan D. Eisenberg to practice law in Wisconsin is revoked, effective April 1, 2010.

¶ 65. IT IS FURTHER ORDERED that within 60 days of the date of this order, Alan D. Eisenberg shall pay to the Office of Lawyer Regulation the costs of this proceeding.

¶ 66. IT IS FURTHER ORDERED that Alan D. Eisenberg comply with the provisions of SCR 22.26 concerning the duties of an attorney whose license to practice law has been revoked.